

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00078-CV

———————————————

VICTORIA DAVID, INDEPENDENT EXECUTRIX OF THE ESTATE OF JEAN CASH DAVID AND AS TRUSTEE OF THE BILL AND JEAN DAVID FAMILY TRUST, Appellant

V.

ALLAN HOWETH, INDIVIDUALLY, AND CANTEY HANGER, L.L.P., Appellees

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-307403-19

Before Gabriel, Kerr, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In two issues, Appellant Victoria David, Independent Executrix of the Estate of Jean Cash David and as Trustee of the Bill and Jean David Family Trust, challenges a take-nothing summary judgment entered in favor of Appellees Allan Howeth and Cantey Hanger, L.L.P. Victoria sued Howeth and Cantey Hanger claiming that they had committed a breach of fiduciary duty by having Victoria's mother, Jean David, execute a will that removed Victoria from her roles as independent executor of Jean's estate and as successor trustee of the Family Trust. Victoria alleges that Howeth, acting as agent for Cantey Hanger, had Jean execute the will when she lacked the capacity to do so and that he took this action to generate fees from another Cantey Hanger client, Frost Bank, who was given the roles of independent executor and trustee of the Family Trust in the new will.

Howeth and Cantey Hanger filed a motion for summary judgment grounded on the affirmative defense of release. Specifically, Howeth and Cantey Hanger claimed that the release occurred in a document that settled the litigation Victoria had filed challenging the attempted probate of the will that she claims Howeth had Jean execute. Though Howeth and Cantey Hanger are not specifically named as released parties in the settlement agreement, we conclude that the claims now made by Victoria against them were mentioned in that agreement and that a stranger reading the agreement could readily identify them as released parties. Thus, we conclude that

2

the trial court properly granted summary judgment in Howeth's and Cantey Hanger's favor on the basis of the affirmative defense of release, and we affirm that judgment.

## II. Factual and Procedural Background

The underlying controversy that led to the execution of the release at issue involved a 1999 will and a 2014 will—both executed by Jean—and the treatment of her daughter Victoria in those wills.

### A. The features of the 1999 Will and the 2014 Will

The 1999 Will's operative features created the Family Trust into which Jean's residuary estate would pass and over which Jean's husband Bill would act as trustee unless he predeceased her; the Family Trust was to be administered for Bill's benefit during his life. The Family Trust provided that upon Bill's death, Victoria would be the beneficiary of the Family Trust for her lifetime; upon Victoria's death, the Trust would terminate, and its assets would be distributed to Jean's grandchildren, who were also Victoria's children. The 1999 Will appointed Victoria as a successor trustee, appointed Bill as Jean's independent executor, and made Victoria the executor upon Bill's death.

Bill passed away after execution of the 1999 Will. Bill's will is not in the summary-judgment record.

The provisions of the 2014 Will noted Bill's passing and the effect of Bill's will, which created the Family Trust for the benefit of Victoria as primary beneficiary and her children as secondary beneficiaries. The 2014 Will in essence removed Victoria

3

from her roles created in the 1999 Will. The 2014 Will noted that Jean had the power to appoint a successor trustee for the Family Trust if Jean became unable to serve in that capacity, and she exercised that power in the 2014 Will by appointing Frost to serve as successor trustee on Jean's death. The 2014 Will also appointed Frost as Jean's independent executor. Finally, the 2014 Will bequeathed all of Jean's property to her grandchildren.

## B. The controversy regarding the execution of the 2014 Will

### 1. Victoria contests the 2014 Will.

Upon Jean's death in 2017, Frost filed an application to probate the 2014 Will. Within days after Frost filed its application to probate the 2014 Will, Victoria sought to probate the 1999 Will and to be given the powers of independent executor of Jean's estate.

Victoria also filed an original petition contesting the 2014 Will. The allegations of the will contest claimed that Jean had lacked the capacity to execute the 2014 Will and had done so as a result of undue influence. The factual allegations of that contest focused on Howeth's actions and the actions of Cantey Hanger employees during Jean's execution of the 2014 Will:

a. [Jean] had a stroke a few days before she executed the [2014] Will.

b. [Jean] did not instruct Allan Howeth, of Cantey Hanger, to prepare the [2014] Will or instruct him to come to Broadway Plaza.

4

c. Ben Bruttell, one of the beneficiaries under the [2014] Will, called Allan Howeth and instructed Allan Howeth to prepare the [2014] Will, travel to Broadway Plaza, and have [Jean] sign the [2014] Will.

d. [Jean] had impaired vision [and] hearing and [had] dementia on the date the [2014] Will was signed.

e. Allan Howeth had to place the pen in [Jean's] hand and help her sign the [2014] Will while other Cantey Hanger employees served as witnesses.

f. [Jean] had no recollection whatsoever of signing a [2014] Will but trusted Allan Howeth.

g. A Guardianship action was filed on May 29, 2014.

h. [Jean] was evaluated by multiple medical professionals and diagnosed with dementia.

i. A judicial determination was made by the Court, based on recurring acts over six months, that [Jean] was totally without capacity. Temporary and Permanent Guardianships were put in place.

j. Frost Bank accepted the role as Trustee of the management trust because of a finding of incapacity.[1]

## 2. Victoria challenges the appointment of Frost as substitute trustee of the Family Trust.

A few months after the filing of the contest, Victoria filed a petition for declaratory judgment against Frost and her children.[2] In essence, the declaratory-

---

[1]The management trust is separate from the Family Trust created in the 1999 Will and was further described in pleadings filed in the probate proceeding as follows: "Decedent's assets are held in a Management Trust created in Cause No. 2014-GD00236-1, styled, *In the Matter of the Guardianship of Jean Cash David, an Incapacitated person*, and pending in Tarrant County Probate Court Number One, Tarrant County, Texas. Frost is the Trustee of the Management Trust."

judgment action challenged the 2014 Will's appointment of Frost as trustee of the Family Trust. The declaratory-judgment action noted the creation of the Family Trust by Bill's will and the appointment of Jean as trustee and Victoria as an alternate trustee. Though it did not provide the level of detail set out in the quoted allegations of Victoria's will contest, the declaratory-judgment action referred to the same matters as a basis to invalidate Frost's appointment. Specifically, the action alleged that Jean had recently suffered a stroke and had impaired decision-making at the time she had appointed Frost as trustee. The action referenced allegations from the will contest filed by Victoria, noting that "[t]here is a will contest on file regarding the execution of said will on the same basis as this objection to the appointment of substitute trustee."

### 3. Proceedings continue in the will contest and in the declaratory-judgment action challenging Frost's appointment as trustee of the Family Trust.

The record contains answers filed by Victoria's children in response to Victoria's filings. In response to the will contest, two of the four children filed their own petitions for declaratory judgment that sought a declaration that the 2014 Will was valid. The two children who filed their own declaratory-judgment actions also sought the appointment of Frost or a suitable person as temporary administrator of Jean's estate during the pendency of Victoria's will contest. The record also contains

---

[2]Although Victoria's children were also Jean's grandchildren, we refer to them throughout the opinion based on their relation to Victoria because she filed the suit.

6

the answers of these children to Victoria's declaratory-judgment action; those answers challenged the jurisdiction of the probate court to hear the declaratory-judgment action and entered a general denial. Victoria's remaining two children filed answers and prayed that Frost take nothing on its application to probate the 2014 Will.

Frost also answered Victoria's declaratory-judgment action. Its answer was a general denial and a request for attorney's fees. An attorney—other than Howeth—from the Cantey Hanger firm is shown as counsel for Frost in that answer. The attorney who signed the answer on behalf of Frost and represented it in the will contest averred in a summary-judgment affidavit that the Cantey Hanger firm represented Frost in its capacities as the proponent of Jean's 2014 Will and as trustee of the Family Trust. The attorney's affidavit noted how the actions of Howeth and Cantey Hanger involving the execution of the 2014 Will were the primary focus of the will contest. The affidavit stated,

> The actions of Allan Howeth and Cantey Hanger with respect to the preparation and execution of Jean David's 2014 Will were the primary focus of the David Estate Litigation and were the subject of extensive discovery. Both Howeth and his assistant Jean Marie Billings were deposed by Victoria David's attorney. In addition, Victoria served voluminous Non-Party Requests for Production on Cantey Hanger, and Cantey Hanger produced hundreds of pages of documents to Victoria David.

In the probate litigation, a different law firm than Cantey Hanger represented Frost on the issues involved with the request that Frost be appointed temporary administrator of Jean's estate pending resolution of Victoria's will contest. A hearing

7

was conducted in the probate court on that request. Victoria testified at the hearing and raised a number of complaints about how Frost had performed in its role as trustee of the Family Trust, as well as trustee of the management trust that was created when Jean became a ward as a result of the guardianship proceeding. During the hearing, Victoria's counsel sought to inquire about Frost's position regarding whether Jean had testamentary capacity when she had executed the 2014 Will, but the probate court did not permit the inquiry. After the hearing, the probate court appointed Frost as temporary administrator of Jean's estate.

### 4. Victoria and the other parties mediate a settlement.

After the appointment of Frost as temporary administrator, the parties mediated their disputes. Frost, as temporary administrator, filed a motion seeking the authorization of the probate court to execute a settlement agreement embodying the terms of a settlement reached during the mediation. The probate court approved the settlement agreement and authorized Frost to execute it.

The settlement agreement provided that the two children who had joined the effort to probate the 2014 Will would each receive $100,000. As a result of this payment, the recipients had no further claim to the assets of Jean's estate and retained rights only as remainder beneficiaries of the Family Trust. Under the terms of the settlement, upon approval of Frost's final accounting of the Estate, Frost resigned as trustee of the Family Trust, and Victoria became both trustee of the Family Trust and independent executor of Jean's estate. The settlement agreement also provided that

upon Frost's filing final accountings for the management trust and Jean's estate, it would be released and discharged by the court.

Victoria, her children, and Frost signed the settlement agreement. Frost signed in the capacities of (1) applicant and proposed executor of Jean's estate, (2) trustee of the Family Trust, (3) trustee of the management trust created for Jean's benefit, and (4) temporary administrator. The attorney from Cantey Hanger who had signed Frost's answer in the probate litigation signed the settlement agreement as counsel for Frost as "applicant and proposed executor" and as trustee of the Family Trust. The attorney from the firm that represented Frost as temporary administrator signed the agreement as counsel for Frost as temporary administrator of Jean's estate and as trustee of the management trust.

The settlement agreement also had extensive releases between the parties that included releases of the parties' "counsel" and specified that "[t]he release as to attorneys relates only to matters reflected in pleadings on file herein as of the date of this agreement."

C.    **The 2019 lawsuit that Victoria filed against Howeth and Cantey Hanger**

More than a year after the execution of the settlement agreement, Victoria, individually and as independent executor of Jean's estate and as trustee of the Family Trust sued Howeth and Cantey Hanger for breach of fiduciary duty (hereinafter the 2019 suit). The petition in the 2019 suit recounted the provisions of Jean's 1999 Will

9

and Bill's death and contained a claim that Jean and Howeth had failed to fund the Family Trust after Bill's death. The petition then went on to outline Howeth's alleged misdeeds with respect to the execution of the 2014 Will:

10. On May 10, 2014, Jean David had a stroke. She was hospitalized and subsequently released to a nursing facility due to her incapacity. On May 15, 2014[,] Allan Howeth visited the Broadway Plaza nursing facility with his assistant and her daughter who were both employees of Cantey Hanger and had Jean David execute a new Will of which Jean David had not requested to have such Will drafted. By his own admission, Defendant, Allan Howeth, testified to the effect that he created the new Will without Jean David's knowledge or consent.

11. Defendant had Jean David sign the Will even though she had no capacity to sign same or no knowledge of what she was signing. This new Will bequeathed all of Jean David's estate to her four grandchildren and named Frost Bank independent "executrix" with grandchildren Jean Bruttell and Benjamin David[] as successor co-executors.

12. Allan Howeth had Jean David sign at the same time of the Will a Durable Power of Attorney and Medical Power of Attorney granting Power of Attorney to her grandchildren, Jean Morris Bruttell and Benjamin David. At the direction of Defendant, Allan Howeth[,] the named grandchildren[] urged the Probate Court to appoint Frost Bank to be appointed guardian of Jean David's Estate on December 10, 2014. Defendant, Allan Howeth, direct[ed] the grandchildren and John Sands of Frost Bank to keep the Will secret from Plaintiff and all others associated [with] or related to Jean David.

The petition went on to allege that Frost had required a release before resigning as "Executor/Trustee" and that Victoria had signed the release under duress. The petition claimed that Cantey Hanger and Howeth had an attorney–client relationship with Jean and seemingly with Victoria. The petition does not describe how Howeth had an attorney–client relationship with Victoria, and in her brief, Victoria describes

10

the attorney–client relationship of Howeth and Cantey Hanger as being "with Jean Cash David in the preparation of her 1999 Will, 2014 Will, and with respect to the David Family Trust."

The petition's allegation of Howeth's motive for having Jean execute the 2014 Will was that the

> appointment of Frost Bank as executor and trustee [would] gain present and future business for Cantey Hanger by representing Frost Bank; wherein, if not directly, Defendant, Allan Howeth, as partner would benefit from the revenue generated by the firm for representing Frost Bank. Frost Bank was able to immediately generate fees for its services, being promoted and protected by Defendant's improperly drafted and executed Will when Defendant knew at all times Jean Cash David had no capacity to sign such a Will appointing Frost Bank.

**D.    The trial court's grant of summary judgment in the 2019 suit based on the settlement agreement executed in the prior probate litigation**

Howeth and Cantey Hanger answered the petition in the 2019 suit and challenged Victoria's standing to sue individually because she was not in privity with Howeth and Cantey Hanger. Victoria dismissed her individual claims. Howeth and Cantey Hanger then amended their answers and pleaded that the settlement agreement that was entered into in the probate proceeding had released the claims alleged against them in the 2019 suit.

Howeth and Cantey Hanger filed a motion for summary judgment based solely on the affirmative defense of release. Victoria filed a response to the motion that included an affidavit stating that the actions of Howeth and Cantey Hanger were not

11

mentioned during the mediation and that it was not her intent to release Howeth and Cantey Hanger when she signed the settlement agreement.

After a hearing, the trial court granted Howeth's and Cantey Hanger's motion and ordered that Victoria take nothing. Victoria filed a motion for new trial, which was overruled by operation of law. Victoria then perfected an appeal from the summary-judgment order.

## III. The Standard of Review that We Apply to a Summary Judgment Based on the Assertion that an Affirmative Defense is Established as a Matter of Law

We recently set out the general standard for reviewing a summary judgment as follows:

> We review a summary judgment de novo. *Tex. Workforce Comm'n v. Wichita Cty.*, 548 S.W.3d 489, 492 (Tex. 2018). Summary judgment is proper when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

*Atmos Energy Corp. v. Paul*, 598 S.W.3d 431, 443 (Tex. App.—Fort Worth 2020, no pet.).

Here, Howeth and Cantey Hanger moved for summary judgment based on the affirmative defense of release. *See* Tex. R. Civ. P. 94 (listing release as an affirmative

12

defense). The burdens placed on a party relying on an affirmative defense to obtain a summary judgment are

> the same . . . as [those placed on] a plaintiff urging summary judgment on a claim. This is because an affirmative defense is "an independent reason why the plaintiff should not recover," not an element of the plaintiff's cause of action. The party asserting an affirmative defense has the burden of pleading and proving it. Only when a party conclusively proves every element of its affirmative defense is it entitled to summary judgment. Thus, a defendant urging summary judgment on an affirmative defense must come forward with summary[-]judgment evidence for each element of the defense.

*Nowak v. DAS Inv. Corp.*, 110 S.W.3d 677, 680 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (citations omitted).

Should a defendant establish its affirmative defense as a matter of law, "the burden of production shifts to the non-movant to defeat the defendant's affirmative defense." *Cohen v. Tour Partners, Ltd.*, No. 01-15-00705-CV, 2017 WL 1528776, at *4 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, no pet.) (mem. op.). A nonmovant has three avenues available to defeat a summary-judgment motion where the affirmative defense is established as a matter of law; he may "(1) demonstrate[] that the motion's legal position regarding the affirmative defense is unsound, (2) raise[] a fact issue on the elements of the affirmative defense, or (3) set[] forth a counter-affirmative defense to the affirmative defense." *Id.*

13

**IV. The Principles that We Apply to Determine Whether the Settlement Agreement Released Howeth and Cantey Hanger**

"The interpretation of a release is a question of law to be decided by the trial court and reviewed de novo on appeal." *Biscamp v. Special Pals, Inc.*, No. 01-19-00005-CV, 2020 WL 716739, at *4 (Tex. App.—Houston [1st Dist.] Feb. 13, 2020, no pet.) (mem. op.) (citing *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999), and *Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997)). "A release is a contractual arrangement that operates as a complete bar to any later action based upon matters covered in the release." *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 885 (Tex. App.—Dallas 2014, pet. denied). As with all written contracts, we "must ascertain the true intentions of the parties as expressed" in the release's language. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).[3]

Overall, we approach the task of identifying the parties' intent by examining and considering "the entire writing in an effort to harmonize and give effect to all the provisions . . . so that none will be rendered meaningless." *Id.* To determine the

---

[3]We do not construe the parties' briefs as arguing that the settlement agreement is ambiguous. Victoria's brief uses the word ambiguity one time when discussing arguments made in the trial court. Howeth and Cantey Hanger set out the standard for determining ambiguity but do not apply that standard in their brief. Of course, even if the parties do not plead or argue ambiguity, we may still determine whether a release is ambiguous. *See McCullough.*, 435 S.W.3d at 888. However, the fact that an agreement lacks clarity or that the parties offer different interpretations of its meaning does not make it ambiguous. *Id.* To be ambiguous, the document must be subject to more than one reasonable interpretation. *Id.* We are satisfied the language of the settlement agreement is not ambiguous.

meaning of the terms used in the release, we look to their "their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used terms in a technical and different sense." *McCullough*, 435 S.W.3d at 885. We also look to "the facts and circumstances surrounding the execution of the release" when construing a release. *Id.* Further, "[w]hen a release refers to a related document, that document should be considered when reviewing a release." *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *5 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op.) (citing *Schomburg v. TRW Vehicle Safety Sys., Inc.*, 242 S.W.3d 911, 913 (Tex. App.—Dallas 2008, pet. denied) (op. on reh'g)).

The overarching standards for deciding whether a release "covers" the claim asserted and whether a particular person has the protection of the release are as follows:

- The release must *mention* the claim. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000) (discussing *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)).

- "[T]he parties need not anticipate and identify each potential cause of action relating to the subject matter of the release." *McCullough*, 435 S.W.3d at 885.

- The release "may encompass unknown claims and damages that develop in the future." *Id.*

15

- "[T]he 'mention' requirement does not bar general, categorical releases, but such releases are to be narrowly construed." *Id.*

- To determine whether a person may claim protection of a release, "the release [should refer] to him by name or with such descriptive particularity that his identity or his connection with the tortious event is not in doubt." *Schomburg*, 242 S.W.3d at 914 (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex. 1984)). "The test in determining the parties included in a release is whether a stranger could readily identify the released party." *Fritts*, 2017 WL 3821889, at *5.

## V.  Analysis

The questions we must answer are whether Cantey Hanger and Howeth are parties released in the settlement agreement and whether the claims asserted against them in the 2019 suit are mentioned in that agreement.  We begin our analysis with the question of whether the claims are mentioned in the settlement agreement.  As explained below, the claims are encompassed by the settlement agreement because of the unique language of the agreement's release provision.  That provision also informs our analysis regarding whether Howeth and Cantey Hanger are released parties, and we conclude that they are.

## A. The release provision of the settlement agreement

We have outlined the course of events that led to execution of the settlement agreement. We now set forth the settlement agreement's release provision, which is the crux of this appeal, and bold certain provisions that are key to our interpretation of that agreement:

> 5. Except as specifically provided herein, the parties hereto shall, and do hereinbelow, drop, waive, abandon, quitclaim[,] and discharge, effective immediately, any and every conceivable claim which they allegedly did have, do have, or could have had, against the other of them, or **their counsel**, and shall and do hereby execute full and complete mutual releases of every conceivable claim that they had against each other, except as regards performance required hereunder.

> 6. For and in consideration of the settlement by all these parties of the disputes between themselves; the taking of actions and exchange of consideration as set forth hereinabove; the release by each of these parties of the other from all obligations with respect to agreements, indebtedness, alleged past action, inaction, conduct[,] or misconduct, all of which is denied, other than the obligations required to further document, implement, and effectuate this agreement; and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed; the undersigned, each acting individually and/or by and through their duly authorized representatives, and for themselves, their affiliated or related companies, agents, successors, assigns, **counsel**, and all others claiming by, through[,] or under them (hereinafter called the "Releasing Parties"), do hereby drop, waive, abandon, quitclaim[,] and discharge any and every conceivable claim which they allegedly did have, do have, or could have had, at the time of this agreement, against each other, and their affiliated or related companies, agents, servants, employees, and **Counsel**, and do fully, finally[,] and forever settle, release, quitclaim[,] and discharge each other, and their affiliated or related companies, agents, servants, employees, and **Counsel**, (hereinafter referred to as "Released Parties"), of and from any and all claims, debts, demands, actions, causes of action, suits, sums of money, and liabilities whatsoever, known or unknown, actual or anticipated, both in law and in equity, existing at the time of execution of

17

this agreement, hereinafter referred to as "Claims[,"] which the Releasing Parties did have, do now have[,] or may at any time in the future have had against any of the Released Parties, individually, jointly or severally, for or by reason or any matter, case or thing whatsoever, including any alleged misconduct, breach of duty, and/or breach of agreement by any of them or their agents, servants, employees, subcontractors, or **counsel**; any damages or loss to any party allegedly resulting from any dealings by or between the parties prior to the date hereof, and to the date of execution of this Agreement; and any claims for affirmative relief made or which could or should have been made in correspondence or pleadings, or otherwise.  This release is intended to cover, and eliminate, any and every conceivable claim between the various parties hereto for any alleged causes of action relating to the matters contained herein which arose prior to, and as of, the date of this Settlement Agreement, except for the obligations created by and/or preserved in this Agreement as provided for hereinabove.  For clarification, if anyone believes that they have claims against Frost, those will have to be asserted in Objections to the Final Accounting prior to Frost['s] seeking judicial discharge and release.  **The release as to attorneys relates only to matters reflected in pleadings on file herein as of the date of this agreement.**

## B.    Why we conclude that the settlement agreement mentions the claims that Victoria asserted against Howeth and Cantey Hanger

As noted above, a release must mention a claim for that claim to be released. *Keck*, 20 S.W.3d at 698.   In her second issue, Victoria asserts that the settlement agreement does not mention the claims that she asserted against Howeth and Cantey Hanger in the 2019 suit.  We disagree.  The settlement agreement has broad general language that would encompass the claims made against Howeth and Cantey Hanger in the 2019 suit.  But that agreement also has a unique provision that indicates that the release—as to attorneys—includes "matters reflected" in pleadings on the date of the settlement agreement.  Relying on the plain, ordinary, and generally accepted meaning

18

of those words, the actions of Howeth and Cantey Hanger were matters reflected in the pleadings at the time of the settlement agreement. Victoria tries to avoid the consequence of this fact by arguing that the pleadings do not assert a claim against Howeth or Cantey Hanger and for that reason, the language of the settlement agreement does not mention the claim. This argument presumes the claim could be released only if it had blossomed into a pleaded cause of action at the time of the settlement agreement. That argument burdens the word "matters" with a meaning that it does not carry by interpreting it to refer to a pleaded cause of action and not to just an event shown in the pleadings.

If Howeth and Cantey Hanger were released parties in the settlement agreement, the general language of the release provision of the settlement agreement is of a breadth to include the claims asserted in the 2019 suit. As shown above, the release's language covers

> any alleged misconduct, breach of duty, and/or breach of agreement by any of them or their agents, servants, employees, subcontractors, or counsel; any damages or loss to any party allegedly resulting from any dealings by or between the parties prior to the date hereof, and to the date of execution of this Agreement; and any claims for affirmative relief made or which could or should have been made in correspondence or pleadings, or otherwise.

The release contained in the settlement agreement later contains another expansive provision:

> This release is intended to cover, and eliminate, any and every conceivable claim between the various parties hereto for any alleged causes of action relating to the matters contained herein which arose

19

prior to, and as of, the date of this Settlement Agreement, except for the obligations created by and/or preserved in this Agreement as provided hereinabove.

Victoria does not dispute that the actions of Howeth and Cantey Hanger occurred prior to the date of the settlement agreement. Nor does Victoria contend that Howeth's and Cantey Hanger's actions could not have been made in a pleading or otherwise.

If we were left to rely solely on the quoted general release language, we might hesitate to find that the claims against Howeth and Cantey Hanger had been released because of the rule that general categorical releases should be narrowly construed. *See McCullough*, 435 S.W.3d at 885. Here, however, the release contains an apparently tailored provision that addresses the scope of the claims released: "The release as to attorneys relates only to matters reflected in pleadings on file herein as of the date of this agreement." Though this is phrased as a limitation on the scope of the release, it also gives us specific direction to what source to examine in determining which claims were released:—"matters reflected in pleadings on file." "Matters reflected" is a phrase using words of common meaning. We may determine the meaning of such words by consulting a dictionary. *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) ("Often, we consult dictionaries to discern the natural meaning of a common-usage term not defined by contract, statute, or regulation."). Looking to dictionary definitions, these words are of a broad scope. Webster's defines "matters" as "the events or circumstances of a particular situation." *Matters*, Merriam-Webster Online

Dictionary, https://www.merriam-webster.com/dictionary/matters (last visited Oct. 15, 2020). The definition of "reflect" that is most relevant here is "to make manifest or apparent: SHOW." *Reflect*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/reflect (last visited Oct. 15, 2020).

Further, when given the direction by the settlement agreement as to "matters reflected in the pleadings on file," we may turn to a source outside the four corners of the release as a reference because we may consider another document when it is referred to in a release. *See Fritts*, 2017 WL 3821889, at *5; *Schomburg*, 242 S.W.3d at 913.

The actions of Howeth and Cantey Hanger were matters reflected or, utilizing the dictionary definitions, "events shown" in the will contest. Indeed, Howeth is depicted as the central player who assisted Jean in the execution of the challenged 2014 Will, with the allegations going so far as describing how he had guided Jean's hand while she signed the will. The later-filed declaratory-judgment action is not as graphic in describing Howeth's actions, but it still reflects those matters by specifically referring to them by alleging that "[t]here is a will contest on file regarding the execution of said will on the same basis as this objection to the appointment of substitute trustee." Howeth's actions were matters reflected in the pleadings on file on the date of the settlement agreement. Thus, the claims against Howeth and Cantey Hanger are mentioned in the settlement agreement.

Primarily in her reply brief, Victoria challenges that the "matters reflected" phrase should embrace the claims that she now makes against Howeth and Cantey Hanger. The pivot point of this argument attempts to pigeonhole what was alleged in the will contest and the 2019 suit by distinguishing between the causes of action alleged in the different actions. Victoria emphasizes that the will contest was predicated on "the ground of undue influence." The 2019 suit, she points out, is predicated on a claim for breach of fiduciary duty. Thus, she notes that "[n]owhere does Victoria David's Will Contest petition assert a claim or cause of action against Howeth or Cantey Hanger for breach of fiduciary duty." She then elaborates on the elements of a claim for undue influence.

Victoria goes on in her efforts to draw a demarcation between the will contest and the 2019 suit. Her attempts to draw the bright line she advocates between the two actions are undermined by concessions that Howeth's actions were matters reflected in that contest. She notes, "Nowhere in any of the Probate Court documents are Appellees included as parties but instead were *merely mentioned* in the supporting <u>facts</u> for Victoria David's Will Contest based on undue influence." [Emphasis added in italics.] Then she concedes that the facts in the two proceedings are similar but again parses them to argue that a stranger would view the claims as dissimilar:

> Although *the facts in the Will Contest petition in the Probate Court are similar to those brought forth in this breach of fiduciary duty lawsuit, the matters are not the same.* The matters in the probate are related to whether the 1999 Will or

22

the 2014 Will should be admitted to probate and who would be appointed Executor/Administrator of the Estate and Trustee of the Family Trust. The matter in the breach of fiduciary duty suit relates to the actions that Appellees took purportedly on behalf of their client, Jean Cash David, but to her detriment while she was incapacitated. These actions are the basis of a breach of a fiduciary duty to Jean Cash David, her estate, and her trust by having her execute the 2014 Will knowing that she lacked the capacity to execute such will. Appellees had Jean Cash David unlawfully execute the 2014 Will to benefit one of Jean Cash David's grandchildren who asked Appellees to change her will and to benefit Cantey Hanger's other clients. In no way, shape, or form could a stranger to the [settlement agreement] view [it] as releasing the breach of fiduciary duty claim against Appellees. [Emphasis added.]

Victoria attempts to engraft too much onto the word "matters." Certainly, Howeth's actions were shown in the will contest as part of the events and circumstances surrounding the execution of the 2014 Will. And nothing in the word "matters" suggests that it intended to go beyond a reference to the events and circumstances by limiting the use of the word to whether the events and circumstances fell within a particular cause of action.

Further, as Howeth and Cantey Hanger point out, Victoria's argument attempts to transform the word "matters" into "claims" made in the pleadings. That transformation is invalid. The words "matters" and "claims" are not equivalent in their meanings, and there were no "claims" made against the attorneys in the pleadings in the will contest. Thus, to interpret the word "matters" as "claims" reads the "matters reflected" sentence out of the agreement and renders it nugatory, which violates the principle of interpretation that we should not adopt an interpretation that render a provision meaningless. *DaimlerChrylser Motors Co. v. Manuel*, 362 S.W.3d 160,

23

178 (Tex. App.—Fort Worth 2012, no pet.) ("We examine and consider the entire document in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006), and *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

Next, Victoria's argument is at odds with the principle of how we are to interpret a release. Those general principles do not require a release to itemize the specific cause of action released. Though narrowly construed, general and categorical releases are permitted. *See McCullough*, 435 S.W.3d at 885. Even more specifically, "the parties need not anticipate and identify each potential cause of action relating to the subject matter of the release." *Id.*

We are not persuaded by Victoria's other attempts to argue that the language of the release shows that it was not intended to embrace the claims against Howeth. She notes that the release states, "For clarification, if anyone believes that they have claims against Frost, those will have to be asserted in Objections to the Final Accounting prior to Frost['s] seeking judicial discharge and release." She construes this sentence to

> indicate that the [settlement agreement] applied to claims that Victoria David and [her children] had against Frost Bank for its actions as temporary administrator, executor, and trustee—not on Howeth or Cantey Hanger's actions of changing Jean Cash David's 1999 Will while she was incapacitated.

24

But this argument isolates the quoted sentence and ignores the additional clarification contained in the sentence that follows it, which is the "matters reflected' sentence that we have discussed in detail.

Nor are we persuaded by the primary case that Victoria cites, which is *Wilson v. Fleming*, 566 S.W.3d 410 (Tex. App.—Houston [14th Dist.] 2018), *rev'd on other grounds*, No. 19-0230, 2020 WL 5985187 (Tex. Oct. 9, 2020). In *Wilson*, a law firm had represented clients in mass litigation against a drug company for injuries the clients had suffered by taking one of the company's drugs. *Id.* at 415. The firm argued that the clients' release of their tort claims against the drug company also effected a release of the law firm for claims that the firm had improperly deducted costs incurred by the firm from the clients' settlement payments. *Id.* at 425. The release executed by the clients stated that they were releasing their claims "related in any way to the alleged ingestion" of the drug at issue. *Id.* The court in *Wilson* agreed that the term "related" is of broad scope but concluded that the law firm's "alleged breaches of duty in its role as appellants' settlement counsel [were] not sufficiently interrelated, enmeshed, or intertwined with the underlying tort claims against [the drug company] as to bring the firm within the scope of 'Released Parties.'" *Id.* at 426. We have already noted that we might have had the same concern as the *Wilson* court if we had to rely solely on the general provision of the release and did not have the clarifying "matters reflected" sentence. The release in *Wilson* had no language that mentioned the claims against the law firm as we have. Thus, *Wilson* is inapposite to our analysis.

At bottom, Victoria tries to limit the reach of the words "matters reflected" by engrafting the requirement that the words should carry a reference to a particular cause of action. But the words themselves do not carry that limitation. And to engraft that limitation on them would saddle them with strictures contrary to the rules of interpretation governing releases. Because we hold that Victoria's claims against Howeth and Cantey Hanger were mentioned in the settlement agreement, we overrule her second issue.

### C. Why we conclude that Howeth and his firm Cantey Hanger are released parties

Now, we turn to the question of whether Howeth and Cantey Hanger were released parties because they were described with adequate descriptive particularity in the settlement agreement. In her first issue, Victoria asserts that a stranger reading the settlement agreement could not reasonably identify Howeth and Cantey Hanger as being parties that were released by the settlement agreement. We disagree. Because of numerous references to "counsel" in the settlement agreement and the impact of the "matters reflected" sentences that we just examined, we conclude that they are.

The settlement agreement has numerous references to "counsel." Initially, the agreement provides that "**the parties hereto** shall, and do hereinbelow, drop, waive, abandon, quitclaim[,] and discharge, effective immediately, any and every conceivable claim which they allegedly did have, do have, or could have had, against the other of them, or *their* **counsel**." [Emphases added.] The definition of "Released Parties"

26

also includes a reference to counsel when it states that the Releasing Parties "do fully, finally[,] and forever settle, release, quitclaim[,] and discharge **each other**, and **their** affiliated or related companies, agents, servants, employees, and **Counsel**." [Emphasis added.] In turn, the "Releasing Parties" are "**the undersigned**, each acting individually and/or by and through their duly authorized representatives, and for themselves, their affiliated or related companies, agents, successors, assigns, counsel, and all others claiming by, through[,] or under them." [Emphasis added.]

The Vice President of Frost signed the settlement agreement on behalf of Frost and noted that Frost was acting as "applicant and proposed executor," as "Trustee of the David Family Trust (the Bill Trust),"[4] and as temporary administrator of Jean's estate.[5] As previously noted, the attorney serving as "counsel" for both the Family Trust and the applicant and purported executor of Jean's estate was an attorney with the firm of Cantey Hanger; that attorney signed the settlement agreement as the attorney for Frost in the first two capacities, and another firm signed as representing Frost for the latter two.

Thus, on its face, the settlement agreement has the temporary administrator of the estate releasing "counsel" for Frost as the applicant and purported executor of

---

[4]The settlement agreement defined "Bill's Trust" as the Family Trust. The agreement states, "Bill's Trust as used herein is intended to refer to and include the Bill and Jean David Family Trust."

[5]Frost also signed as trustee of the management trust that was created for Jean when she was placed in a guardianship.

Jean's estate and the trustee of the Family Trust. The Family Trust is releasing "counsel" for the applicant and proposed executor of Jean's estate, and the Family Trust is doing likewise for the applicant and purported executor.

And the settlement agreement goes further by its inclusion of the sentence that we analyzed above that provides, "The release as to attorneys relates only to matters reflected in pleadings on file herein as of the date of this agreement." We have no explanation why this sentence uses the word "attorneys" as opposed to the term "counsel," which was used in the more formulaic portion of the release provisions. But we have already explained in detail why the breadth of this sentence reaches the actions of Howeth and his firm Cantey Hanger because Howeth's actions are matters reflected in the pleadings.

Thus, it is clear that a Cantey Hanger attorney acted as "counsel" for Frost in the various capacities mentioned. The open question is whether the reference to "counsel" and "their counsel" reaches to another attorney affiliated with the Cantey Hanger firm—Howeth—for actions not related to representation of Frost in the will contest. In other words, is the word "counsel" an identifier of Frost's counsel in the will contest or a broader reference? Victoria argues that the settlement agreement could not be read by a stranger to readily include Howeth and his actions as a member of the Cantey Hanger firm. We disagree.

The word "counsel" must include both the individual lawyer signing the agreement and his firm—Cantey Hanger. It would be unreasonable to read the

28

agreement as covering the individual lawyer representing Frost but not his firm Cantey Hanger because to do so would subject the firm to whatever vicarious liability it might have for the lawyer's actions in the will contest and associated litigation, making the release meaningless.[6] Thus, a stranger would have to read the settlement agreement as reasonably including the firm of Cantey Hanger.

That Cantey Hanger and its agents were also involved in Jean's execution of the 2014 Will would have been apparent to our hypothetical stranger looking to all the facts that he or she would be entitled to examine in determining whether Cantey Hanger was a party described in the settlement agreement. The will contest pleading that initiated the matter being settled specifically described Howeth as "of Cantey Hanger." It goes on to describe that "Allan Howeth had to place the pen in [Jean's] hand and help her sign the [2014] Will while *other Cantey Hanger employees* served as witnesses." [Emphasis added.]

---

[6]The 2019 suit alleges that Cantey Hanger operates as an LLP; thus, we set forth the law on an LLP's liability:

> If the law firm is practicing as a limited liability partnership[,] the partnership, but not an individual partner, is liable for the malpractice of another partner if the other partner is not under the supervision or direction of the first partner at the time of the errors, omissions, negligence, incompetence, or malfeasance occurred, unless the first partner was directly involved in the malpractice or had notice of it at the time it occurred.

Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Civil Practice* § 2:92 (2nd ed. 2019).

Further, some of the circumstances surrounding the execution of the settlement agreement that can be examined in interpreting it include the litigation that it settled. The summary-judgment record sets that context by indicating that the conduct of Howeth and Cantey Hanger was the "primary focus" of the litigation and that their actions were subject to extensive discovery. Though not conclusive, that circumstance is another that the stranger could place in the mix when deciding whether the reference to "counsel" goes beyond the actions of the lawyer representing Frost in the will contest.

And again, the settlement agreement itself provides that "[t]he release as to attorneys relates only to matters reflected" in the pleadings at the time of execution of the settlement agreement. As we have done, the stranger reading the document would ask how other references to attorneys in the settlement agreement impacted the scope for the reference to counsel. The presence of that sentence, which appears to be a tailored provision of the agreement, reasonably prompts the question whether there is additional conduct by "attorneys" that is included in the scope of the release. Indeed, one asks why this sentence was included if the reference to "counsel" included only the actions of counsel representing Frost in the will contest.

The answer to that question is that a stranger reading the sentence would conclude that the settlement agreement reasonably includes Howeth and Cantey Hanger for the actions associated with the execution of the 2014 Will. We have already discussed the breadth of the term "matters reflected" and how the actions of

Howeth and Cantey Hanger were matters reflected in the pleadings on file in the will contest and declaratory-judgment suit filed by Victoria and also were the focus of the litigation that led to the settlement agreement. The "matters reflected" sentence not only brings the conduct of the Cantey Hanger lawyer who appeared as counsel in the will-contest litigation within the ambit of the settlement agreement and its reference to "counsel" but also informs a conclusion that the term "counsel" includes the actions of Cantey Hanger's agents in assisting Jean with the execution of the 2014 Will.

Victoria challenges Howeth and Cantey Hanger's argument for an expansive definition of the word "counsel,"[7] contending that her opponents

> seek to extend who is covered as "counsel" under the [settlement agreement] "by expressly narrowing the scope of the attorney[s'] release[s] to [']matters reflected in the pleadings filed herein[']" to include Howeth and Cantey Hanger. Appellees do so because Howeth and Cantey Hanger were "the only counsel whose conduct is referenced in the pleadings." However, this is an extreme stretch of the imagination. Simply because a person's name is mentioned in the supporting facts and they happen to hold the title of "counsel" does not make Appellees "counsel for each and every signatory[.]" Howeth drafted both the 1999 and 2014 Wills[ and] acted as Notary Public in the 2014 Will, and two

---

[7]Howeth and Cantey Hanger argue that

the [settlement agreement] doesn't refer to lead counsel, trial counsel, counsel of record[,] or attorney in charge. It simply identifies "counsel" as among the "Released Parties." Giving that term its ordinary or plain meaning rather than the more technical and narrow meaning associated with a term such as lead counsel, Cantey Hanger, including its partner Howeth, was "readily identifiable" as Frost's "counsel" as applicant for the challenged will and thus a "Released Party" under the terms of the [settlement agreement].

31

> Cantey Hanger employees acted as witnesses to the 2014 Will. However, neither Howeth nor Cantey Hanger were acting in their capacity as "counsel" in Victoria David's Will Contest when they breached their fiduciary duty to Jean Cash David by changing her will while she was incapacitated. [Citations omitted.]

In essence, this argument tries to read the "matters reflected" sentence out of the settlement agreement. From a practical standpoint, we do not conclude that it is such a stretch of the imagination that Frost would want the actions of Cantey Hanger in allegedly obtaining execution of the 2014 Will released in the settlement agreement. Our inquiry in interpreting the settlement agreement is bounded by its terms, the documents it references, and the circumstances surrounding its execution, but we can understand why it was reasonable for Frost to include in the release the matters reflected in the pleadings involving its attorneys or counsel. Though Frost was released by the settlement agreement, presumably it did not want to be further involved in future litigation involving Jean's estate or the Family Trust. The release of its attorneys for matters reflected in the pleadings protected Frost from the situation that it now finds itself in as result of the 2019 suit. It is prominently named in a suit alleging that it was the beneficiary of acts taking advantage of an elderly, infirm woman and will potentially be involved in the expense of responding to third-party discovery and testimony associated with that suit.

Further, though we are not persuaded that an unqualified reference to counsel in and of itself is a guide to view the agreement as embracing acts outside those of counsel representing a party in the will contest, we are also not persuaded by

Victoria's arguments regarding why it would be unreasonable to read the settlement agreement as including the actions of Cantey Hanger's agent with respect to Jean's execution of the 2014 Will. Victoria notes that in the 2019 suit, Howeth and Cantey Hanger are not being sued as counsel for Frost nor is Frost being sued. This argument begs the question. Cantey Hanger did act as Frost's counsel in the various capacities noted, the agreement covers Frost's counsel, and the settlement agreement has the tailored "matters reflected" provision that expands the conduct of counsel covered by the release.[8]

Furthermore, although we do not rely on the litigation privilege—the general rule that attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation—for the expansive definition of "counsel" that Howeth and Cantey Hanger would place on it,[9] the litigation privilege

---

[8]Victoria also argues that only specific individual attorneys represented Frost in the probate litigation and that Howeth and Cantey Hanger have provided no proof that anyone other than these lawyers "performed any tasks related to the litigation under which the [settlement agreement] was drafted, entered, and signed either in their motion for summary judgment, any subsequent response, nor in their brief before this Court." This statement is true but again ignores how the settlement agreement addressed matters outside the conduct of these individual lawyers.

[9]Howeth and Cantey Hanger suggest that the inclusion of "counsel" in the settlement agreement in and of itself must mean that the word encompasses more than the conduct of counsel representing a party in the will contest. Victoria asserts that this argument misapplies the litigation privilege because

> [u]nder the litigation privilege that Appellees reference, the [settlement agreement] would release them from liability for their actions in representing an opposing party which was Frost Bank in this case.

provides another basis to support our view of the impact of the "matters related" sentence. *See Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).

That is, if the actions of counsel in representing the parties in the will contest did define the reach of the word "counsel"—actions for which the litigation privilege would provide additional protection—why the added reference to "matters reflected" in the pleadings? It is a signal that matters outside the representation of a party in the will contest are covered by the settlement agreement.

As Victoria also points out, the settlement agreement's drafters could have done a much better job by explicitly including Howeth and Cantey Hanger for the actions of its agents in obtaining execution of the 2014 Will. But the standard of interpretation we apply is not one of perfect clarity. Our standard is whether a stranger would read the settlement agreement to reasonably include Howeth and Cantey Hanger, and we conclude that a stranger would.

Finally, Victoria argues that it is unreasonable to read the settlement agreement as Jean's estate and the Family Trust releasing claims against their own attorneys. Victoria notes that the 2019 suit does not make any claim about the actions of the counsel that represented Frost as temporary administrator and instead is based on Howeth's and Cantey Hanger's actions with respect to Jean's execution of the 2014

However, the litigation privilege would not apply to Jean Cash David's breach of fiduciary duty claims against Howeth and Cantey Hanger because they were her own attorneys—not opposing counsel.

34

Will. Again, this statement is true as far as it goes, but it does not come to grips with the unique scope of the settlement agreement.[10]

Victoria also argues that she did not have the authority to release anyone for claims owed by Jean's estate or the Family Trust until she was qualified to perform those roles several months after the settlement agreement was executed. We are unsure what this argument means. Frost, as temporary administrator of Jean's estate requested the probate court's authorization to execute the settlement agreement, and the probate court approved the agreement.

---

[10]The parties also disagree regarding whether Howeth and Cantey Hanger owed Jean's estate and the Family Trust any duty. Howeth and Cantey Hanger rely on *Barcelo v. Elliott* for the proposition that a lawyer drafting a will or trust instrument owes no duty to the persons named as beneficiaries in the instrument. 923 S.W.2d 575, 577–79 (Tex. 1996). Victoria counters with cases that place an executor in privity with a decedent's attorney and allow a suit for legal malpractice by the executor. *See Smith v. O'Donnell*, 288 S.W.3d 417, 419 (Tex. 2009); *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 782 (Tex. 2006). Some courts outside Texas question whether a lawyer owes a duty to beneficiaries to ensure that a client has the capacity to execute a will. *See Moore v. Anderson Zeigler Disharoon Gallagher & Gray, P.C.*, 135 Cal. Rptr. 2d 888, 895 (Cal. Ct. App. 2003) (holding that attorney preparing will for client owes no duty to beneficiary of will or to beneficiary under prior will to ascertain and document testamentary capacity of client); *Logotheti v. Gordon*, 607 N.E.2d 1015, 1018 (Mass. 1993) (holding that attorney owed heir no duty to be reasonably alert to indications client was incompetent or was subject to undue influence); *Mills v. Burrage*, No. 40536-5-I, 1998 WL 549384, at *2–3 (Wash. Ct. App. Aug. 31, 1998) (not designated for publication) (holding that beneficiaries under prior will lacked standing to sue attorney who drafted subsequent will on grounds that attorney had failed to adequately investigate testator's testamentary capacity).

The 2019 suit tries to wire around any impediment from privity by attributing a selfish motive to Howeth for having Jean execute a will that appointed Frost as trustee and executor. We do not reach the question of how the interplay of the various rules of privity might impact Victoria's claims but instead base our decision on the language of the settlement agreement.

For the reasons that we have outlined, we conclude that a stranger reading the settlement agreement would reasonably identify Cantey Hanger and its agent Howeth as released parties in the settlement agreement. We overrule Victoria's first issue.

## VI. Conclusion

After analyzing the terms of the settlement agreement, we conclude that it mentions the claims made against Howeth and Cantey Hanger in the 2019 suit. We also conclude that, after reading the terms of the document and the pleadings to which it refers and knowing the circumstances surrounding its preparation, a stranger could readily identify Howeth and Cantey Hanger as released parties. Thus, we conclude that the summary judgment entered by the trial court was correct, and we affirm that judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 22, 2020